(No. 4609-)

CROSBY GARRETT, BLED HOWELL AND JOHN KIMBROUGH, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed June 22, 1956.*

KAMIN AND GLEASON AND EARLE BROOKS, Attorneys for Claimants.

L ATHAM C ASTLE , Attorney General; M ARION G. T IERNAN , Assistant Attorney General, for Respondent.

W HAM , J.

This is an action brought by claimants, Crosby Garrett, Bled Howell and John Kimbrough, against respondent, State of Illinois, to recover damages for personal injuries sustained by each of them on May 5, 1952, while riding in an automobile, owned and operated by Crosby Garrett, which was being driven in a westerly direction along and upon West Pershing Road at or near the twelve hundred block in Chicago, Illinois. Crosby Garrett also seeks to recover for damage to his automobile in the amount of $50.00, the balance of the collision loss having been paid by his insurer.

Claimants charge in their complaint that the State of Illinois was in control of this particular portion of West Pershing Road, and that certain construction work was then in process. They allege that it was the duty of respondent to exercise ordinary care in maintaining the highway, and to place barricades and lights in and around the roadway under repair, so that the surface of the road would remain in a reasonably safe condition for use by motorists; that, notwithstanding this duty, respondent negligently failed to furnish the necessary

lights, warnings of, or barricades to apprise the motorists of a certain defect in the roadway, which consisted of a sunken portion of the pavement surrounding a manhole cover, so that it created a dangerous and hazardous obstruction to vehicular traffic.

It is further contended by claimants that, while Garrett was operating his automobile in a westerly direction on West Pershing Road, it struck the defective road surface around the manhole, thereby causing it to go out of control and into an iron post, resulting in the injuries and damages claimed.

Respondent filed no answer to the complaint, and, therefore, under Rule 11 of this Court, a general denial of the facts set forth in the complaint is considered as filed.

It was stipulated between the parties to the action that 39th Street between Halsted Street and Ashland Avenue, which included the scene of the accident in question, at and before the accident of May 5, 1952 was a state highway, operated and maintained by respondent.

It was undisputed that, for some time prior to the date of the accident and for some time thereafter, this section of the road was being resurfaced by the Municipal Paving Corporation under a contract with the State of Illinois. It is further undisputed that during this period of time it was necessary to break the pavement out around the manholes on this stretch of road, raise them, and refill them to the level of the newly surfaced roadway. It is also undisputed that this section of highway was open to the public, and that no part thereof was closed. There is a dispute, however, as to the condition of the road with respect to manholes at the time of the accident. This dispute is material, inasmuch as the defect

complained of was a trench several inches deep around one of the manholes, which defect caused the automobile to go out of control.

The evidence of claimants established that at approximately 5:00 A. M. they were proceeding west on that section of the roadway enroute to their work on a construction project in Maywood, Illinois. All claimants lived in the same neighborhood, and took turns driving their respective autos to and from work. On this particular day, claimant, Crosby Garrett, was driving his automobile. It was not yet daylight, and the street lights were not in operation on the bridge. Claimant Garrett testified that he was aware of no defect in the road until his auto with a "great thud and shock" struck the depression, and veered to the left out of control into an iron pole on the south curb of the bridge.

A Mr. Eugene Larcker, a filling station attendant, who was sweeping the driveway of the filling station where he worked, which filling station was located in the vicinity of the place of the accident, heard claimants' auto hit the depression, saw it go to the left, and strike the pole. He went to the scene of the accident, and found a hub cap from the automobile on the manhole. He described the manhole cover as being approximately one-half inch above the paved road, and surrounded by a trench 5 to 6 inches deep from the top of the cover to the bottom of the trench. He stated that the trench was about 6 or 7 inches wide. He further stated that this depression around the manhole was not filled, and had been in that condition for at least two or three days prior to the accident; that there were no lanterns or barricades around the manhole at the time of the accident; that barricades

and lanterns were put up the next day, and that the hole was thereafter repaired.

Thomas Fallon, Police Officer, City of Chicago Accident Unit, testified on behalf of claimants that he and Officer Frank Madden received notice of the accident by radio, and arrived at the scene of the accident before the automobile had been moved. He testified that the street was under construction at the time, but that he saw no signs showing it to be under construction. His investigation disclosed that the automobile had struck a protruding manhole. His inspection of the street area revealed that the surface had been partially removed around the manhole cover, and had not been filled. He testified that the cover was about one and a half feet in diameter, and that about 8 inches around it was dug out below the surface of the road. He further testified that there were no lights or barricades around the hole. He testified that the distance from the pole, which the automobile struck, to the manhole was approximately 100 or 150 feet.

Claimant, Bled Howell, testified that he was sitting in the front seat of the automobile, and glimpsed the manhole when they were approximately two feet away. The automobile went down suddenly, plunged to the left, and hit the light pole, at which time he lost consciousness. He further testified that there were no street lights burning; that the auto lights were on; that it was between night and dawn, and that they were proceeding at approximately 20 to 25 miles per hour when they hit the manhole.

Claimant Kimbrough testified that he was riding in the back seat, and that the automobile was being driven at approximately 20 to 25 miles per hour when they hit the manhole, and thereafter ran into the pole. He stated

that, although he knew the road was under construction, the road was open for traffic at the time, and there were no barricades, lights or signs in the vicinity of the bridge upon which the accident occurred.

The only evidence offered by respondent concerning the existence of the defect was the testimony of Mr. Eugene H. Kroon, then a Civil Engineer employed by the State of Illinois, and charged with the duty of inspecting the work being done by the Municipal Paving Company, his assistant, Joseph W. Pecenansky, and Frank W. Hansford, District Construction Supervisor for the State of Illinois. Although these witnesses testified generally with respect to the progress of the construction and repair of this particular portion of the highway, none had any knowledge that the accident had happened until two years thereafter. Their testimony was based, for the most part, upon written memoranda and records that they kept with respect to the progress of the work, and general statements to the effect that they did not notice any defect around a manhole, as was described by claimants' witnesses.

We believe that, on consideration of the evidence, the direct testimony of the existence of the defect by the city policeman, Thomas Fallon, the filling station attendant, Eugene Larcker, and claimants' testimony as to the manner in which the accident happened, claimants have borne the burden of proof with respect to the existence of the defect. We realize that it is difficult for respondent to offer any more definite testimony than was presented, especially in view of the fact that its witnesses had no knowledge of the accident until after a great lapse of time. Without the happening of this accident having been called to their attention so that a specific inspection

could have been made prior to any change in the surface after the accident, we believe that the specific testimony of claimants' witnesses weighs more heavily than the general testimony of respondent's witnesses.

The next question we must consider is whether or not respondent was responsible for the existence of the defect. Prior to the trial, respondent filed a motion to dismiss the complaint on several grounds, one of which was that respondent was not in charge of the maintenance and control of the construction work on the highway in question, and that all the work, maintenance control, responsibility and liability in regard to the construction work was that of the Municipal Paving Company, by reason of the contract then existing between respondent, State of Illinois, and the Municipal Paving Company.

A copy of the contract was attached to the motion, and it contained the usual indemnity clause and save harmless agreements for any negligence of the contractor or its employees in performing or in safeguarding the work, etc.

The motion of respondent was denied in accordance with the well established rule prevailing in this state to the effect that the duty to exercise ordinary care to maintain a state highway in a reasonably safe condition for public travel rests primarily with the state, and the duty cannot be evaded or suspended by delegating it to others by independent contractual arrangements or otherwise.

This is the same rule long applying to municipalities in this state. Volume 9, Section 491, *Illinois Law and Practice*, page 44; *Koch* vs. *City of Chicago*, 297 Ill. App. 103 at 110; *Cole* vs. *City of East St. Louis*, 158 Ill. App. 494 at 500; *Lau* vs. *City of Chicago*, 153 Ill. App. 50

at 54; *Village of Jefferson* vs. *Chapman,* 127 Ill. 438 at 444. Since the enactment of the 1945 Court of Claims Law, these same basic rules governing liability for injuries and damages caused by defective streets and highways are applicable to the State of Illinois.

It is, therefore, clear that the fact the repairs were being performed by an independent contractor in no way affects the question of liability of respondent in this case. Whether or not the Municipal Paving Company is liable over to respondent on the contract for any damages respondent must pay is not now before this Court, and we, therefore, will not discuss that question.

With respect to the question of actual or constructive notice, which is always a necessary element in the establishment of a claim against the state growing out of a defective highway, it is apparent from the record that respondent, through its engineer, Eugene Kroon, and his assistants, had knowledge of the particular types of repairs being performed. While it is true their testimony negatives any knowledge on their part of the particular defect complained of, respondent was bound to know continuously what was being done by the contractor, the character of the work, and the conditions as they changed from time to time. In short, respondent was bound to know whether there was any danger arising by reason of the repairs, which might cause injury to the public, and, having such constructive knowledge, was bound to know whether they should have closed the road for travel, or placed the necessary barricades and warning devices to guard against the defect. Volume 9, Section 495, *Illinois Law and Practice,* page 52; *Law* vs. *City of Chicago,* 153 Ill. App. 50 at 56.

Moreover, the testimony of claimants' witness, Eugene Larcker, was to the effect that this defect existed for at least "two or three days" prior to the happening of the accident. This was sufficient time under the facts and circumstances herein for respondent to have become apprised of this defect, and taken the necessary action in safeguarding the public by either requiring the contractor to place proper warning barricade signs and lights around the defect, or to do so itself.

From the above, it is our conclusion that claimants have borne the burden of proof by a preponderance of the evidence that respondent was negligent in failing to warn the traveling public, including claimants, of this defect.

The question of contributory negligence on the part of claimants is, in our judgment, not in issue in this case, since the testimony of the only witnesses to the accident is sufficient, in our judgment, to establish the exercise of due care on the part of claimant Garrett, who was driving the automobile.

Having determined the question of liability in favor of claimants, we will, therefore, consider their damages.

With respect to claimant, Crosby Garrett, the evidence reflects that he sustained a fracture of the left wrist. Dr. Samuel I. Weiner testified on behalf of claimants as an examining rather than a treating physician. He examined the X-Rays, which had been taken of claimant's wrist at the Cook County Hospital on the date of the accident, as well as on subsequent dates, and found therefrom a fresh transverse fracture of the styloid process of the radius of the left wrist joint. He stated, in his opinion, this was due to trauma. He further testified that an X-Ray taken at Cook County Hospital on

June 6, 1952, approximately a month after the accident, portrayed the wrist immobilized in a plaster paris cast, and that the fracture line was in good alignment. He also testified that the X-Rays reflected a congenital condition at the distal fragment of the styloid process of the ulna, which condition is known as an ossicle, and had existed since childhood. He stated that it did not result from the trauma in question.

He further testified that he examined claimant on July 20, 1954, and found that the left wrist was enlarged; that on manipulating the wrist claimant lacked about 20 degrees dorsal flexion, about 30 degrees palmer flexion, and had some restriction ''for radial deviation''.

He also testified that he had taken an X-Ray of claimant's wrist on the date of the examination, which was July 20, 1954, and, in comparing the X-Ray he made with the X-Ray of the Cook County Hospital, found that his X-Ray of the styloid process of the ulna portrayed that the distal end had become enlarged, indicating a disturbance that caused it to grow and become twice its original size.

Respondent offered as a witness to Garrett's condition Dr. Fred W. Hark, an orthopedic surgeon, residing at River Forest, Illinois. His qualifications were admitted by claimants. He testified that on July 31, 1954 he made an examination on behalf of respondent, and stated that ''to look at the wrist, you would not think there was anything wrong with it. There was nothing objective, as you examined the wrist. He has a full range of motion in all directions. There were no tender spots palpable on his forearm or hand.'' Dr. Hark testified that he took an X-Ray, which was identified and admitted into evidence as respondent's exhibit No. 4. The doctor stated

that "The X-Ray is centered about his wrist. It shows the base of the radius and ulna, and the carpal bones, which make up the wrist. The general alignment of the base of the radius is excellent. There is no evidence of arthritis in this X-Ray. The fracture line is well healed, which went through the radius, and on the ulna there is a little ossicle at the end of the styloid process. This is well rounded, and gives one the impression of being an extra bone, a congenital anomaly." He further testified that the ossicle had nothing to do with the fracture.

The witness then examined claimant's exhibits Nos. 9-B, 10-B and 10-C, which were X-Rays taken of the left wrist of claimant at the Cook County Hospital on May 5, 1952. He stated that the fracture did not go completely across the entire radius, but just across the styloid process. He further stated that the base of the radius itself was not involved. He further stated that the X-Ray portrayed the same congenital anomaly found in the X-Ray taken by this witness. He stated that, in the X-Ray he took, it was clear that it was a congenital anomaly, while in the original X-Ray "you could not tell".

The witness then examined claimant's exhibit No. 14, which was the X-Ray taken by Dr. Weiner, and stated with respect thereto: "Well the fracture throughout the styloid of the radius is well healed, and it is very difficult, in fact, you sort of have to use your imagination to see where the fracture line was. There is no excess callus or anything that would point it out, if you did not know he had an injury. Of course, the extra bone on the ulna of the styloid shows, as we commented when we looked at the first X-Ray."

The witness was then asked for his opinion with respect to the condition of the wrist at the present time,

based upon the examination and interpretation of the X-Rays. He answered, "That he has a good end result without disability".

On cross-examination, the witness testified that there was no evidence of proliferation in the late X-Ray, as compared to the early X-Rays. The witness explained that proliferation is the formation of excess bone in response to trauma or irritation.

From the above, it is apparent that the two doctors are in considerable conflict with one another concerning the present condition of the wrist.

Claimant Garrett testified that prior to the accident he was employed as a laborer on a sewer and tunnel construction job in Maywood, Illinois. He testified he received $106.00 per week prior to the accident, but after returning to work some nine weeks later, accepted a lighter job, receiving only $75.00 per week, which job expired shortly thereafter. He next obtained a position at the post office sorting mail at $65.00 a week, and thereafter a job as an auto bumper maker for $75.00 per week. At the time of the trial he was working as an employment counselor for himself, interviewing people, and aiding them in obtaining jobs.

He testified that his arm was in a cast for eight weeks, and, after it was removed, he received no other treatment. His only testimony with respect to his ability to work after the injury was that he "was lucky enough to get a lighter job"; that the lighter job expired, and he quit rather than go back to "concrete work", which he performed prior to the accident. He stated that the reason he could not go back to the concrete work was that he could not use his wrist at all. Thereafter, he worked in the post office for four months, then obtained a job

with an automobile bumper manufacturer for several months, and then became self-employed. Nowhere in his testimony does he claim not to be able to use his wrist at the present time. The mere fact that his wrist was not fully recovered some five months after the accident is no evidence of permanency. His only complaint at the present time is that ''I don't think that it's completely healed, because during cold rainy weather it feels sort of like rheumatism, and I think that I have a restricted motion to the arm. I can't turn it as far as I could. I definitely don't have as strong a grip.''

With respect to the employment record of claimant Garrett, respondent offered John M. Lefevour, time keeper of M. J. Boyle and Company, for whom Garrett worked both prior and subsequent to the accident. This witness testified that Garrett returned to work in the week ending July 6, 1952, and the payroll records, introduced as respondent's exhibit No. 1, reflect that he continued to work until the week ending October 12, 1954. The witness testified that the record reflected that this claimant received approximately the same weekly payment for work after he returned, as he did prior to the accident. He further testified that Garrett worked at the same labor classification, and at the same rate of pay before and after the accident. This witness did not know the reason why Garrett left the employment in October.

From the above, we cannot say that claimant has borne the burden of proving by a preponderance of the evidence an injury of any great permanence. The evidence, particularly with respect to the present limitation of motion, is in conflict, as we have above pointed out, and claimant's own testimony does not to our satisfaction

establish any great loss of motion, excessive pain, or inability to obtain employment.

We believe that an amount of $3,050.00, which would include the loss of property damage to claimant's automobile, would be a fair award to claimant, Crosby Garrett.

Claimant, Bled Howell, sustained an injury to the left ankle and lower leg, the exact nature of which is not definite. He testified that he was earning approximately $121.00 a week prior to the accident, and also worked for the Boyle Construction Company. He was taken to the Cook County Hospital, and remained 21 days, after which he was confined to his home. A cast was placed on his left leg, and removed approximately 2½ to 3 months after he left the hospital. He also suffered a blow and cut on his forehead, which required stitches. He attempted to return to work in October, but was unable to obtain further employment from Boyle, and about the middle of October went to work for the Major Corporation, a construction company, at Hammond, Indiana, as a carpenter's helper. He complained that he is dazed when working on scaffolding. He worked as a carpenter's helper until December 17, 1952 at $2.20 an hour. He testified that his take-home pay from such a job was $75.00, while his take-home pay while working for Boyle was $121.00. Subsequent to that employment, he worked for the Kenney Construction Company doing the same type of work. He has worked steadily from then until the present time.

With respect to claimant Howell's employment record, respondent's witness Lefevour testified that, while working for M. J. Boyle and Company, Howell received $2.35 per hour as a miner. Respondent's exhibit No. 1 is a photostatic copy of the payroll record of Howell while

working for Boyle, which record reflects his average weekly take-home pay at approximately $94.00 per week.

Howell complains that his ankle is stiff, but has had no regular medical attention, and has been caring for it himself by soaking it in hot water two or three times a week.

Dr. Weiner testified as an examining physician with respect to the X-Rays taken by the Cook County Hospital of claimant Howell's leg, and X-Rays taken by him on July 24, 1954. Dr. Weiner was unable to find any bony pathology from any of the X-Rays taken on May 5, 1952, while claimant was in the Cook County Hospital. He, however, found from the X-Ray taken on July 1, 1952 "an osteoporosis of the distal end of the fibula and tibia above the ankle joint, and . . . an involvement of the tibial fibular articulation".

Dr. Weiner testified that he took an X-Ray of claimant's leg on July 8, 1954. He testified that there were no visible fracture lines on this X-Ray, but that this type of pathology frequently results from a united fracture. He testified that in the lateral view he noticed a thickening and irregularity of the anterior aspect of the fibula. He further found that there was an obliquity of the ankle joint proper, and described it as not a normal condition. He stated that the obliquity is "from lateral from the outside proximo to the medial side distally". He further found that the fibula tibial articulation is abnormally widened, and that the widening could have resulted from a fracture of the shaft of the fibula above the joint with some rotation of the distal fragment.

Dr. Weiner further testified that he examined claimant Howell, and found motion was noticeably restricted in the left ankle in each direction, which amounted to

about 15 degrees in comparing it with the motion of the right ankle. He also stated that an examination of the left ankle revealed an oblique surgical scar on its lateral aspect.

He testified that claimant had obtained a fair result, and the only thing that could improve it further was a major operation, an osteotomy—a splitting of the bone above the ankle, and making a wedge, so that the weight bearing axis of the tibia would be coming down the mid line of the talus. In answer to the Commissioner's question, Dr. Weiner stated, "In layman's language this person has an ankle joint, which is oblique instead of straight, and, therefore, has a painful, partly stiff ankle joint. That is in plain English." The doctor further testified that there may not have been an actual fracture of the bone, but a separation of the ligament from the bone, which would cause the oblique condition of the ankle.

He further testified that the X-Rays reflected a congenital condition on the posterior aspect of the talus. He stated that this condition could not cause the thickening of the tibial fibular articulation "because it was in back and away from the ankle joint". He stated, however, that it could cause pain.

Respondent's witness, Dr. Hark, testified that he examined claimant Howell on behalf of respondent on July 31, 1954; that there was a moderate amount of swelling about the entire ankle, and that the general alignment of the left foot was excellent. He testified that dorsal flexion and plantar flexion were limited to about 70% of normal, and claimant's prosupination, the ability to turn his foot sideways, was probably limited to about 60% of normal. Respondent's exhibit No. 5, an X-Ray taken of claimant Howell, was interpreted by Dr. Hark as

showing an excellent general alignment of the bones with no evidence of arthritis about the joints. Dr. Hark also interpreted the X-Rays taken at Cook County Hospital on May 5, 1952. He stated these X-Rays show what is called a subastragali dislocation. The astragalous stayed with the tibia, and all of the other bones of the foot are away from it. He stated that this was the result of trauma, but there was no evidence of fracture. It was a dislocation. This witness also interpreted claimant's X-Ray, which was taken on July 1, 1952 at the Cook County Hospital, as showing the bones in very good alignment, and also showing considerable bone atrophy.

This witness also interpreted claimant's exhibit No. 13, taken on July 20, 1954 by Dr. Weiner, as showing the bones in good alignment, and "the oblique view shows this extra bone, whose margins again are nice and round, which we associate with congenital ossicle", and shows the ankle bone returned to a good alignment; that it does not show any widening of the fibula tibia articulation. He characterized the ankle joint as having a normal appearance. He stated that the end of the fibula looked normal. The doctor further testified that there was swelling in the ankle that could not have resulted from the congenital condition, which he spoke of. He stated that the swelling could be the result of trauma or arthritis, or could be the aftermath of a spastic flat foot. He gave an opinion, based upon a reasonable degree of medical certainty, that Howell had sustained a subastragaloid dislocation. He stated that it is unusual for the swelling to persist for such a long period of time from just a simple dislocation. His prognosis was that he doubted whether it would ever improve, and stated, "I think it will stay as it is now, unless he begins gritting his teeth and makes

that work. Lots of people work with stiffness at the joints.''

On cross-examination, the witness testified that the swelling testified to would probably be caused by trauma, assuming that the ankle, before injury, was without swelling.

After considering the record in respect to claimant Howell's injuries, it is the conclusion of the Court that he sustained an injury of some permanence, but one which has not disabled him from pursuing a gainful occupation similar in nature and earnings to that performed by him prior to the accident. Including loss of earnings, we believe that an amount of $6,700.00 is a fair award.

The injuries sustained by claimant Kimbrough were not serious. He testified that he was shaken up, sustained cuts on his forehead and across the back of his ankles. He received first aid treatment at the Cook County Hospital, his cuts were bandaged, and he left after two hours. These cuts healed leaving scars, the extent of which are not shown by the testimony. He lost eleven days work. He earned approximately $96.00 take-home pay per week.

We believe that an amount of $250.00 is a sufficient award.

We, therefore, allow the claims presented in this case in the following amounts: To claimant, Crosby Garrett, $3,050.00; to claimant, Bled Howell, $6,700.00; to claimant, John Kimbrough, $250.00.